# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHEET METAL WORKERS LOCAL 17 TRUST FUNDS, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| GENERAL ELECTRIC COMPANY, JOHN L. FLANNERY, RUSSELL STOKES, and JAMIE S. MILLER, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Sheet Metal Workers Local 17 Trust Funds ("Plaintiff"), by and through its attorneys, brings this federal securities class action on behalf of all persons or entities that purchased or otherwise acquired GE common stock between December 27, 2017 and October 29, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq.* (the "Exchange Act").  Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by General Electric Company ("GE" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on GE's website concerning the Company's public statements; and (d) review of other publicly available information concerning GE and the Individual Defendants.

## I.     NATURE OF THE ACTION

1.     GE is a 126-year old industrial conglomerate with a number of primary business units, including Lighting, Aviation, Healthcare, Power, and Capital.

2.     GE's largest and most important segment, by far, is GE Power, which earned $36 billion in revenue in 2017—nearly 30% of the Company's revenue for the year.  The vast majority of GE Power's revenue comes from the sale and servicing of its Gas Power Systems – large gas turbines that the Company sells to power utilities across the globe.   As a *Reuters* article put it, "[t]he giant machines form the beating heart of billon-dollar electricity plants

around the world."  In 2017, GE Power was the leading manufacturer of gas turbines, with more than 50% of global market share.

3.     In recent years, GE staked the future of its GE Power segment on the development of a new turbine type called the "H-Class," also known as High Efficiency, Air Cooled ("HA"), which purported to deliver improved efficiency and reliability over prior turbines, and was expected to drive customer demand.  Indeed, GE has repeatedly publicly claimed that, of its competitors, "none can offer the outstanding performance, reliability, efficiency, and expertise of GE H-class gas turbine."

4.     In reality, the H-Class turbine was disastrously defective.  Specifically, the coating used to keep the turbines' blades from overheating was ineffective, leading to dangerous oxidation that could cause the turbines to fail after as little as one year of use, in turn causing power outages in the areas serviced by the utilities using GE's turbines, and requiring months-long repairs.  Indeed, as was later revealed, data from French utilities showed that power plants using GE's H-Class turbines suffered *four times as many outages* as other plants.

5.     At the same time GE was introducing the new H-Class turbine product, GE Power made its largest-ever industrial acquisition in 2015, acquiring French company Alstom's power business for $10.6 billion.  By the end of 2015, GE's Power segment goodwill balance had ballooned to nearly $23 billion, increasing to $26.4 billion at the end of 2016.  The Alstom acquisition turned out to be a disaster and GE overpaid at the top of the market, right at the time that demand was beginning to wane in what had become an oversupplied global power market. Despite GE Power's earnings and outlook deteriorating substantially throughout 2017, the Company's Power segment goodwill remained valued at over $25 billion as of December 31, 2017.

6.      Early in the Class Period, signs of trouble were emerging with GE's H-Class turbines, but defendants assured the public that the problems were minor, easily fixable, and in no way widespread or systemic. For example, on December 27, 2017, *Reuters* published an article titled, *"In Pakistan, Questions Raised over GE's Flagship Power Turbines*," reporting that GE's "flagship gas turbines ran into problems in Pakistan earlier this year, leading to delays and lengthy outages at three newly built power stations."  According to the article, the GE H-Class turbines that began running in the beginning of 2017 in Pakistan were "producing at levels well below their capacity and the problem was acute in the crucial summer months, when temperatures in the country frequently exceed 40 degrees Celsius (104 °F)."  However, in a statement to *Reuters*, GE denied there were any issues with the H-class turbines, assuring the public that "every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency."  Specific to GE Power's gas turbines running in Pakistan, GE represented, "[W]e've encountered and communicated openly about launch challenges and readily resolved issues during this time."

7.      Indeed, during the Class Period, defendants represented that GE Power "is a fundamentally strong franchise with leading technology" and GE was "proud of the HA gas turbine technology."  Further, GE assured investors that the Company's installed turbines units were "performing to specifications and guarantees."  When GE Power began to experience "softening demand" for its turbines in the first quarter of 2018, GE falsely attributed this reduction entirely to external factors, such as "excess capacity in developed markets," and "continued pressure in oil and gas applications and macroeconomic and geopolitical environments…energy efficiency, renewable energy penetration and delays in expected orders," rather than any performance issues with the turbines.

8.     In late September 2018, investors began to learn the truth about GE's "flagship" H-Class turbines.  On September 19, 2018, defendants disclosed by a LinkedIn post that four H-Class turbines were shut down due to blade problems that were discovered at power plants in Texas owned by Exelon.  The Company also admitted that a series of delays had impacted "the completion of the three HA-equipped power plants in Pakistan" which GE said "were caused by a mix of factors - some in our control and others that were out of our hands."  Through the LinkedIn post, defendants revealed that the Company had "identified an issue that we expect to impact our HA units" involving "an oxidation issue that affects the lifespan of a single blade component."  GE further warned that the same oxidation issue was likely to lead to additional turbine shutdowns at other plants.   However, defendants again downplayed the issue, assuring investors that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine – they are meeting – and in many cases exceeding – their performance goals at every customer site today."

9.     Analysts were incredulous.  In a note to investors, JPMorgan analyst Stephen Tusa warned that the issue with some gas-turbine blades threatened to hurt GE Power's earnings and damage its reputation when it was already losing market share.  Contrary to defendants' prior claims that reduced demand was purely a result of the market, Tusa stated that there could no longer be any doubt that GE Power's turbine issues were "company-specific" and "structural," and not due to the "cyclical nature of the power industry downturn."  Tusa also explained that the blade issue was not a simple or minor problem to fix, as repairs to the faulty turbines would require "close to perfection [on] a microscopic level."  Over the next four trading days, in response to fallout from the turbine issues, GE's stock price dropped $1.59 per share or

12%, from $12.86 per share on September 19, 2018 to $11.27 per share on September 25, 2018 — wiping out over $13 billon in the Company's market cap.

10.     Shortly thereafter, on October 1, 2018, the Company unexpectedly announced that it had removed Defendant John L. Flannery as chairman and CEO after only a year on the job and had replaced him with Lawrence Culp.  GE also announced that it would likely have to take a $23 billion goodwill impairment charge for its ailing Power business, eliminating almost all of the goodwill it recorded on its balance sheet for its Power business.

11.     On October 30, 2018, GE made several stunning announcements. In Culp's first quarterly report with the Company since taking over as CEO, GE confirmed a massive goodwill impairment charge of $22 billion related to GE Power, disclosed that the SEC and Department of Justice had launched civil and criminal investigations into the goodwill charge, slashed its dividend to 1 cent, and announced that it would be forced to reorganize its Power business, separating the floundering Gas Power Systems business from the rest of the segment, with Defendant Russell Stokes no longer in charge of that part of the business.

12.     Moreover, the Company's Q3 2018 results revealed that structural flaws in GE Power's H-Class turbines had caused demand to plummet and costs to skyrocket, as utilities around the globe halted their orders for new turbines and demanded costly repairs under warranty for their existing turbines.  Indeed, by the end of Q3 2018, GE had sold a mere 28 turbines in the first nine months of the year, compared to 63 in the prior year – a decline of *56%*.

13.     Significantly, after a mere month on the job, CEO Culp admitted that Defendants had misrepresented the state of GE's Power segment.  Indeed, Culp stated during the Company's conference call that "what we need to do at Power is wring out a little bit of the undue optimism."  Culp added: "this is a good opportunity for us to, frankly, manage this franchise

better than we have…Clearly, there are a lot of issues that -- from the past that the team is dealing with."

14.     The market reacted in astonishment. Discussing the gravity of GE's announcement, former SEC Chairman Harvey Pitt, stated: "Companies don't write down this amount of money and not get held accountable."  Pitt further added: "You have to get it right, and you start behind the eight-ball when the number is $22 billion."

15.     In reaction to GE's disclosures, the Company's stock plummeted an additional $0.98 per share from $11.16 per share on October 29, 2018, to $10.18 per share on October 30, 2018—a significant decline of over 9% wiping out $8.5 billion  more of the Company's market capitalization in one trading day.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because the Company conducts a substantial amount of business in this Judicial District and a significant portion of Defendants'

actions, and the subsequent damages, took place within this District. Further, GE's common stock trades on the NYSE, located within this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

21.     Plaintiff Sheet Metal Workers Local 17 Trust Funds, as set forth in the accompanying certification, incorporated by reference herein, purchased GE common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant GE is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts. GE contains a number of business units, including Lighting, Aviation, Healthcare, Power, Renewable Energy, Additive, Digital, and Capital.

23.     Defendant John L. Flannery ("Flannery") was named Chief Executive Officer ("CEO") and Chairman of GE in August 2017. On October 1, 2018, it was announced that the Board of Directors had unanimously voted him out and replaced him with H. Lawrence Culp, Jr. Defendant Flannery was GE's eleventh CEO and the company's tenth chairman. His short tenure of barely a year is notable for a company with a storied history of long serving CEOs.

24.     Defendant Jamie S. Miller ("Miller") was, at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of GE.  Defendant Miller joined GE in 2008 as

Vice President, Controller and Chief Accounting Officer, and later became CFO in October 2017.

25.     Defendant Russell Stokes ("Stokes") was, at all relevant times, the Chief Executive Officer and President of GE Power Portfolio and a Senior Vice President of GE as of June 2017.  Defendant Stokes joined GE in 1997 in the Financial Management Program.  Prior to his positions at GE Power, Defendant Stokes was the President and CEO of GE Energy Connections, the electrification, grid and controls business of GE.

26.     Defendants Flannery, Miller and Stokes are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of GE's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Background of the Company**

27.     GE is a 126-year old industrial conglomerate incorporated in the State of New York and headquartered in Boston, Massachusetts.  GE contains a number of primary business units, including Lighting, Aviation, Healthcare, Power, and Capital.

28.     GE Power is an energy production segment of GE that provides equipment, solutions, and services worldwide.  GE Power's major products include gas and steam turbines, engines, generators, high-voltage equipment, and power generation services.  According to GE's latest Annual Report, the mission of GE Power is "Powering lives & making electricity more affordable, reliable, accessible & sustainable."  GE's Form 10-K for the year ended December 31, 2017 ("2017 Form 10-K") states that GE Power "serves power generation, industrial, government and other customers worldwide with products and services related to energy production and water reuse."  The 2017 Form 10-K states that GE Power's gas power system "offers a wide spectrum of heavy-duty and aeroderivative gas turbines" such as the High Efficiency, Air Cooled ("HA") Turbines models "for utilities, independent power producers and numerous industrial applications, ranging from small, mobile power to utility scale power plants."   As of 2018, GE Power plants produced one-third of the world's electricity.

29.     The HA turbines were developed in 2014.  There are two model lines: the 7HA and 9HA gas turbines.  According to GE's corporate website, as of January 28, 2019, GE had 86 orders, of which 58 units had shipped, and of which 32 units are in operation for its HA series in total. HA units had operated for a total of 250,853 hours.

B.    **Defendants' Materially False and Misleading Statements**

1.    **Statements Regarding GE's Pakistan Relationship**

30.    On December 27, 2017, before the market opened, *Reuters* published an article

titled, *In Pakistan, Questions Raised over GE's Flagship Power Turbines*, where it reported that

GE's "flagship gas turbines ran into problems in Pakistan earlier this year, leading to delays and

lengthy outages at three newly built power stations." The relationship between GE and Pakistan

started in 2015 when "GE won the contracts to supply Pakistan with six turbines for three power

stations." According to the article, GE's flagship gas turbines, which included GE's 9HA-class

gas turbines and began running in early 2017 in Pakistan, were "producing at levels well below

their capacity and the problem was acute in the crucial summer months, when temperatures in

the country frequently exceed 40 degrees Celsius (104 °F)."

31.    In a statement to *Reuters*, GE emphatically denied that there were any systemic

design or structural problems with the turbines, claiming that "every commercial HA site today

is demonstrating exceptional performance levels for both output and efficiency." Specific to the

GE Power's gas turbines running in Pakistan, GE represented, "We've encountered and

communicated openly about launch challenges and readily resolved issues during this time. It's

important to note that challenges are common with power plants of this size and complexity

during the commissioning and early operations phase."

32.    On January 22, 2018, *Reuters* published an article titled *Pakistan's PM Says

Confident GE Will Fix 'Technical' Issues With Gas Turbines*. *Reuters* reported that Pakistan's

Prime Minister had said that some of GE's flagship new gas turbines "were still suffering from

technical issues such as 'vibration.'" *Reuters* also reported that Pakistan's former petroleum

minster said the gas turbines "'have vibration issues, some have technical issues.'" In response

to the former petroleum minister's concerns, GE reiterated its December 27, 2017 statement to *Reuters*: "Together we've encountered and communicated openly about launch challenges and readily resolved issues during this time – it's important to note that challenges are common with power plants of this size and complexity during the commissioning and early operations phase. We remain committed to supporting customer and site needs with the highest standards of quality and excellence."

### 2.   Fourth Quarter 2017 Financial Results

33.     On January 24, 2018, GE announced its fourth quarter 2017 and full year results and held a conference call with investors.   During the conference call, Defendant Stokes represented that GE was "proud of the HA gas turbine technology" as "[i]t is operating in line with performance guarantees."   While Defendant Stokes acknowledged "some issues related to commissioning at certain sites," he represented that GE had "readily addressed them" and "have commenced working on supply chain and project organizations to address volume ramp issues and things considered normal learning curve process."   Lastly, Defendant Stokes represented that all of the 23 units installed were "performing to specifications and guarantees."

34.     On February 23, 2018, GE filed its 2017 Form 10-K, reporting a goodwill year-end balance for its Power segment of over $25 billion, slightly below its 2016 year-end balance of $26 billion.   In discussing the valuation of its Power market goodwill impairment, the Company stated, in pertinent part:

> Due to the overall decline in the Power market, we performed an interim step-one analysis of our Power Generation reporting unit within our Power segment, which indicated that its fair value has declined since our last impairment test; however, [the goodwill] was still significantly in excess of its carrying value. We will continue to monitor the Power markets and the impact it may have on this reporting unit.

* * *

As of December 31, 2017, we believe no other goodwill impairment exists, apart from the impairment charges discussed above, and that the remaining goodwill is recoverable for all of our reporting units; however, there can be no assurances that additional goodwill will not be impaired in future periods.

### 3.    First Quarter 2018 Financial Results

35.    On April 20, 2018, the Company released its results for the first quarter of 2018. During the conference call, Defendant Flannery represented, "We have the leading franchising gas turbines, a strong position in wind, cutting-edge technology, digital expertise, grid and automation capability…."

36.    On May 1, 2018, the Company filed its Form 10-Q for the first quarter of 2018 ("Q1 2018 Form 10-Q") and reported a goodwill quarter-end balance for its Power segment of over $25 billion, unchanged from the end of 2017.  In the Q1 2018 Form 10-Q, the Company represented that demand for GE Power's turbines had declined due to "excess capacity in developed markets, continued pressure in oil and gas applications and macroeconomic and geopolitical environments have created softening demand for gas turbines" and "softer than expected during the first quarter of 2018" in the power market "due to energy efficiency, renewable energy penetration and delays in expected orders."

### 4.    June 26, 2018 Business Update Call

37.    On June 26, 2018, GE conducted a business update conference call with analysts. In discussing GE Power, during the call, Defendant Flannery represented that GE Power "is a fundamentally strong franchise with leading technology, a valuable installed base, and expansive global research" with "approximately 7,000 gas turbines in our installed base and we have a 20-year plus track record that demonstrates we can improve output, reliability, and performance of those assets when we service them."

5.    **Second Quarter 2018 Financial Results**

38.    On July 20, 2018, GE released its results for the second quarter 2018 ended and reported that Power revenue fell 19 percent, and held a conference call with investors to discuss the Company's second quarter results.   During the conference call, Defendant Flannery represented that the Power "team continues to focus on rightsizing footprint, reducing base costs, improving quality and maximizing the value of our installed base."

39.    On July 27, 2018, GE filed its Form 10-Q for the second quarter of 2018 ("Q2 2018 Form 10-Q") which included new language related to its impairment testing of goodwill. In regards to impairment testing regarding the Power Generation and Grid Solutions units, the filing stated:

> In assessing the possibility that a reporting unit's fair value has been reduced below its carrying amount due to the occurrence of events or circumstances between annual impairment testing dates, we consider all available evidence, including (i) the results of our impairment testing from the most recent testing date (in particular, the magnitude of the excess of fair value over carrying value observed), (ii) downward revisions to internal forecasts or decreases in market multiples (and the magnitude thereof), if any, and (iii) declines in our market capitalization (and the magnitude and duration of those declines), if any. As a result of this assessment, we performed an interim step-one impairment test at our Power Generation and Grid Solutions reporting units within our Power segment in the second quarter of 2018. The results of the analysis indicated that fair value was in excess of carrying value by approximately 10% for our Power Generation reporting unit and 9% at our Grid Solutions reporting unit.
>
> *   *   *
>
> As of June 30, 2018, we believe goodwill is recoverable for all of our reporting units. However, the Power and Oil & Gas markets continue to be challenging which could result in changes in our projected future earnings and net cash flows at these businesses as a result of sustained declines in macroeconomic or business conditions affecting our reporting units and there can be no assurances that goodwill will not be impaired in future periods. The planned sale of our Distributed Power business is not expected to materially affect the goodwill impairment test results for our Power Generation reporting unit noted above.

40.    In the Q2 2018 Form 10-Q, the Company further represented that demand for GE

Power's turbines had softened due to "excess capacity in developed markets, continued pressure in oil and gas applications and macroeconomic and geopolitical environments have created softening demand for gas turbines" and "softer than expected during the first half of 2018" in the power market "due to energy efficiency, renewable energy penetration and delays in expected orders."

41.     The above statements in paragraphs 31-40 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) the design and technology of GE Power's flagship gas turbines were structurally flawed as they were plagued with an oxidation problem that caused the blades in the H-Class gas turbines to fail; (ii) GE Power's goodwill was materially overstated, in large part because of such structural issues; (iii) the Company lacked adequate internal and financial controls; and (iv) as a result of the foregoing, Defendant's public statements were materially false and/or misleading and/or lacked a reasonable basis.

**C.     The Truth Is Slowly Revealed**

42.     On September 19, 2018, Defendant Stokes published an article on LinkedIn disclosing at the very end of a long post that the Company had "identified an issue that we expect to impact our HA units.  It involves an oxidation issue that affects the lifespan of a single blade component."  Despite the disclosure, Defendant Stokes sought to minimize the problem, claiming that "we have identified a fix and have been working proactively with HA operators to address impacted turbines."  Defendant Stokes positively touted GE Power's turbines by representing that the "minor adjustments that we need to make do not make the HA any less of a record setting turbine – they are meeting – and in many cases exceeding – their performance goals at every customer site today."

43.    In his LinkedIn post, Defendant Stokes also belatedly admitted that the delays that had impacted "the completion of the three HA-equipped power plants in Pakistan" "were caused by a mix of factors – some in our control and others that were out of our hands."   Again, Defendant Stokes positively touted GE Power's HA technology:

> [T]hrough close cooperation with our customers, suppliers and government stakeholders, we were able to deliver, and the plants are expected to supply up to 3,600 megawatts for 30 plus years – the equivalent amount of electricity needed to power up to 7.3 million Pakistani homes. Today, our HA technology is providing Pakistan with efficient, flexible, reliable and low-cost power, enhancing the country's ability to meet its growing energy needs and improving the lives of millions of citizens.

44.    Immediately, various media outlets and analysts commented on Defendant Stokes' revelation of the oxidation issue with GE Power's HA turbine units.   For example, on September 20, 2018, *Reuters* published an article titled *Four General Electric Power Turbines Shut Down in U.S. Due to Blade Issue*.   Specifically, *Reuters* reported "that four of its new flagship power turbines in the United States have been shut down to an 'oxidation issue' and warned it expects the problem to affect more of the 51 units it has shipped."   Significantly, *Reuters* also reported that GE expected "the same issue will impact other HA units" which meant that GE would be responsible for significant costs associated with the oxidation issue.

45.    Also on September 20, 2018, Tusa, an analyst from JPMorgan ("JPM") commented in a report that the turbine failure related to "a first stage blade" and "raises red flags around risks that are both financial and fundamental" for GE Power.   Tusa concluded, "While the debate can rage around the structural versus cyclical nature of the power industry downturn (we believe structural), if as bad as it seems, we believe there should be no longer any doubt that GE Power has company-specific issues."

16

46.     JPM was also highly skeptical of GE's claims that the issues that had occurred with the GE HA turbine blades at Exelon power plants were minor and relatively insignificant. Indeed, JPM felt that the H-frame blade failure risked franchise impairment, and cast significant doubt on Defendant Stokes' comments about "minor adjustments."  As that report stated,  "this is the most difficult part to design, manufacture and repair, made from proprietary nickel based single crystal alloys requiring close to perfection a microscopic level," and it "will be a massive undertaking to establish the cause of failure, redesign the turbine blade, develop hard tooling at casting vendors, learn to cast, machine and apply coatings to the new blade, schedule customer outages and send service crews to sites around the world."

47.     Tusa emphasized that even after having "conversations with management implying that the new blade is already in production, we wonder why the new blades were not being used to prevent such a situation.  In other words, we struggle to believe that the fix is permanent or to just to keep the turbine running in the near term."  Tusa commented that the problems at GE Power were "company-specific issues," which included "the decline in the profit pool from its large installed base of services, but now around the H-frame technology, and potentially on the profitability of the related future services stream that is key to replace the one currently running down, some of which sits on the balance sheet in $9 B of contract assets." Tusa noted that the "issue at Power is much more fundamental and suggests something more systemic" "at a time when the company has almost no wiggle room to spare in a balance sheet that we believe looks nothing like its ratings."

48.     In reaction to these disclosures, GE's stock plummeted $1.59 per share or 12%, from $12.86 per share on September 19, 2018, to $11.27 per share on September 25, 2018 – wiping out over $13 billion in the Company's market cap.

49.     On October 1, 2018, GE announced that Larry Culp would succeed John Flannery as GE's Chief Executive Officer.  In the same press release, the Company revealed that, although preliminary, it was taking a massive $23 billion impairment charge related to its GE Power business—a charge so large that it effectively wiped out all of GE Power's goodwill, including all of the goodwill related to Alstom:

> While GE's businesses other than Power are generally performing consistently with previous guidance, due to weaker performance in the GE Power business, the Company will fall short of previously indicated guidance for free cash flow and EPS for 2018. In addition, GE expects to take a non-cash goodwill impairment charge related to the GE Power business. GE Power's current goodwill balance is approximately $23 billion and the goodwill impairment charge is likely to constitute substantially all of this balance. The impairment charge is not yet finalized and remains subject to review. The Company will provide additional commentary when it reports third quarter results.

50.     On October 10, 2018, Tusa published an analyst report about the HA turbine blade issues in the context of the overall deteriorating situation in GE Power.  While Tusa noted that "the consensus seemingly continues to ignore on-the-ground realities in exchange for hope around a new CEO, if the $23B goodwill charge, guide down, and CEO change were not enough," he emphasized that there are "serious technology issues with the new flagship product."  Specifically, Tusa noted, "While most of the focus has been on the technology around the blades, which GE has more or less admitted to with a reference to a fix, details below indicate a myriad of shortfalls in other parts of the turbine that we find hard not to consider 'technology flaws.'"  Tusa pointed out a litany of problems and failures with the H-frame technology such as the blade failures but issues with controls, vibrations, and Axial Fuel Staging. He continued,

> The commentary is a reminder of the hurdles to a "fix" for a Power business that is already set to lose money on a GAAP basis, with pronounced free cash outflows, facing not only macro headwinds, but more competition/overcapacity, and now company specific technology issues. We are not sure what is left to determine "asset value" here as issues like this are not solved by a simple recall

and re-ship. These are engineering feats that need to be validated, typically taking time measured in years not months, and in long cycle technology businesses where a new product gets introduced every couple of decades, missing a cycle has long term implications.

51.     He added that the news revolving the situation at GE Power, including the issues with the H-frame blades, was, "a legitimate driver of the related stock decline, with enough uncertainty and downside implications for a highly levered company with no available cash flow, and little room for error, to justify further downside, especially from current levels."  As a result, it seems to Tusa "that GE overpromised and likely took on risk for customers to win deals."

52.     On October 30, 2018, GE made several stunning announcements.  In Culp's first quarterly report with the Company since taking over as CEO, GE confirmed a massive goodwill impairment charge of $22 billion related to GE Power, disclosed that regulatory investigations related to the Company's accounting had expanded to include the goodwill impairment write-down, including a DOJ criminal investigation, slashed its dividend to 1 cent, and announced intentions to reorganize its Power business.  The press release stated:

> GE announced results today for the quarter ended September 30, 2018. The Company reported a loss of $2.63 per share from GAAP continuing operations. As summarized in the attached reconciliation, adjusted earnings per share (non-GAAP) were $0.14, down 33 percent from the same period in 2017. The Company recorded a non-cash goodwill impairment charge of $22 billion, before tax, related to GE Power.

> The Company also announced immediate actions to strengthen its balance sheet and position its businesses for success.

> First, GE plans to reduce its quarterly dividend from $0.12 to $0.01 per share beginning with the Board's next dividend declaration, which is expected to occur in December 2018. This change will allow GE to retain ~$3.9 billion of cash per year compared to the prior payout level.

> Second, GE intends to reorganize Power to accelerate the business' operating and financial improvements. GE plans to create two units — a unified Gas business combining GE's gas product and services groups, and a second unit constituting the portfolio of GE Power's other assets including Steam, Grid Solutions, Nuclear, and Power Conversion. The Company also intends to consolidate

Power's headquarters structure to ensure these units can best serve their customers.

53.     In addition, on the Company's October 30, 2018 conference call, in discussing the Company's $22 billion charge related to the Alstom acquisition, Defendant Miller announced that "the SEC expanded the scope of its ongoing investigation to include the goodwill charge" and that the "Department of Justice is also investigating this charge."

54.     Moreover, CEO Culp essentially admitted that Defendants' statements about GE Power, and its goodwill, were false.  Indeed, Culp stated during the Company's conference call that "what we need to do at Power is wring out a little bit of the undue optimism."  Culp added: "[r]ight now I'm spending most of my time with the Power business . . . We need to establish a realistic outlook there, particularly for the gas business; and drive improvements from there…" Further, in regard to GE's Power segment, Culp stated: "this is a good opportunity for us to, frankly, manage this franchise better than we have…Clearly, there are a lot of issues that -- from the past that the team is dealing with."

55.     In regards to splitting GE Power into two units and minimizing GE Power's CEO's position, Culp revealed that both of the units "will report directly to me" instead of Defendant Stokes.

56.     Also, Defendant Miller discussed the booking of multiple impairments during the quarter in connection with GE Power.  Specifically, Defendant Miller revealed that the goodwill charges were connected with the "size of the charge results from the significant value [that were] associated with the unrecognized legacy assets, principally our profitable services backlog, long-standing customer relationships and our gas turbine technology."

57.     In reaction to these disclosures, GE's stock plummeted $0.98 per share from $11.16 per share on October 29, 2018, to $10.18 per share on October 30, 2018—a significant

decline of approximately 9% on unusually heavy trading volume of 345 million shares.  GE's

share price hit a nine-year low.  GE's stock price drop as a result of these revelations wiped out

over $8.5 billion in the Company's market capitalization in one trading day.

58.    Also on October 30, 2018, the *Wall Street Journal* published an article titled *GE's*

*$22 Billion Charge Intensifies Regulatory Scrutiny*.  Former SEC Chairman Harvey Pitt noted

the significance of the massive write-down and how the expanded investigations would focus in

large part on the accounting for goodwill.  The article stated:

> "Companies don't write down this amount of money and not get held
> accountable," said former Securities and Exchange Commission Chairman
> Harvey Pitt. "You have to get it right, and you start behind the eight-ball when the
> number is $22 billion."
>
> The charge is now a focus of two federal investigations into GE's accounting. The
> Justice Department is conducting a criminal investigation into GE's recent
> accounting practices, company finance chief Jamie Miller said on the company's
> quarterly earnings call Tuesday.
>
> That probe is in addition to an SEC investigation launched in November. GE
> Chief Executive Larry Culp declined to comment on the investigations. "They
> will play out as they play out," he told The Wall Street Journal.
>
> The investigations by the Justice Department and the SEC likely will focus on
> examining whether GE accurately followed accounting rules and corporate law
> when allocating goodwill on its balance sheet and when estimating the size of the
> write-down, Mr. Pitt said.
>
> "At issue will be how hard they [GE] looked at this, how diligent they were in
> considering whatever warnings were circulated internally and the rationale for
> ignoring those warnings," he said.
>
> GE's impairment charge is among the biggest in recent history, according to Carla
> Nunes, managing director at valuation firm Duff & Phelps LLC. It is the largest
> such charge since oil producer ConocoPhillips' 2008 impairment of $25.4 billion,
> she said.

59.    On December 7, 2018, *Reuters* published an article titled *Exclusive: GE's Push to*

*Fix Power Turbine Problem Goes Global* where the consensus after conducting a "dozen

interviews with plant operators and industry experts" was that "[p]ower plant operators in Japan, Taiwan, France and at multiple U.S. sites have shut down – or plan to shut down – at least 18 of the 55 new HA-model turbines that GA has shipped so far."  As a result, "GE is setting aside $480 million to repair its 9HA, 7HA and 9FB model turbines as it restructures its power business."  Following the blade problems at Exelon, "state-owned utility Electricite de France closed its plant in the northern French town of Bouchain for a month starting in late September for blade replacements.  Bouchain was the first plant worldwide to install GE's 9HA turbine" in January 2017.  From January 2017 through October 2018, "Bouchain has logged 86 outages for equipment failure, testing or other reasons…five times the average for non-GE plants."

## V.    CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired GE common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of GE and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, GE's common stock was actively traded on the New York Stock Exchange ("NYSE") (an open and efficient market) under the symbol "GE."  Millions of GE shares were traded publicly during the

Class Period on the NYSE.  As of September 30, 2018, GE had 8.7 billion shares of common stock outstanding.  Record owners and the other members of the Class may be identified from records maintained by GE and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

62.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of GE;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of GE;

23

e)     whether the market price of GE common stock during the Class Period

was artificially inflated due to the material misrepresentations and failures

to correct the material misrepresentations complained of herein; and

f)     the extent to which the members of the Class have sustained damages and

the proper measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

**VI.     UNDISCLOSED ADVERSE FACTS**

66.     The market for GE common stock was an open, well-developed and efficient

market at all relevant times.  As a result of these materially false and misleading statements and

failures to disclose described herein, GE common stock traded at artificially inflated prices

during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise

acquired GE common stock relying upon the integrity of the market price of the Company's

securities and market information relating to GE, and have been damaged thereby.

67.     During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of GE common stock, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make Defendants' statements, as

set forth herein, not false and misleading.  Said statements and omissions were materially false

and misleading in that they failed to disclose material adverse non-public information and

misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

68.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about GE's financial well-being and prospects.

69.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.    LOSS CAUSATION

70.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of GE common stock and operated as a fraud or deceit on Class Period purchasers of GE common stock by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of GE common stock fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of GE common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

71.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of GE's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused GE to conceal the truth.

72.     Defendants' false and misleading statements had the intended effect and caused GE's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

73.     The decline in the price of GE's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of GE's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of GE's common stock and the subsequent decline in the value of GE's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  <u>SCIENTER ALLEGATIONS</u>

74.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

75.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding GE, their control over, receipt and/or modification of GE's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning GE, participated in the fraudulent scheme alleged herein.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

76.     At all relevant times, the market for GE's common stock was an efficient market for the following reasons, among others:

g)      GE common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

h)      As a regulated issuer, GE filed periodic public reports with the SEC and the NYSE;

i)      GE common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

j)      GE regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

77.     As a result of the foregoing, the market for GE's common stock promptly digested current information regarding GE from all publicly available sources and reflected such information in GE's stock price. Under these circumstances, all purchasers of GE's common stock during the Class Period suffered similar injury through their purchase of GE's common stock at artificially inflated prices and a presumption of reliance applies.

78.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding GE's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.     NO SAFE HARBOR

79.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

80.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GE who knew that the statement was false when made.

## XI.     COUNTS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

82.     During the Class Period, GE and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GE common stock; and (iii) cause Plaintiff and the other members of the Class to purchase GE common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

83.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for GE common stock in violation of §10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of GE, as alleged herein.

84. GE and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of GE as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of GE's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about GE and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of GE's common stock during the Class Period.

85. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the

Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

86.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing GE's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

87.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of GE common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of GE shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade,

and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired GE common stock during the Class Period at artificially inflated high prices and were damaged thereby.

88.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of GE, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired GE common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

89.     By virtue of the foregoing, GE and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

91.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.     The Individual Defendants were and acted as controlling persons of GE within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations

and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

94.     As set forth above, GE and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XIII.   **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: February 8, 2019

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
Rhonda Cavagnaro
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com
rcavagnaro@saxenawhite.com

**SAXENA WHITE P.A.**
Joseph E. White, III
Lester R. Hooker
150 East Palmetto Park Road
Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com
lhooker@saxenawhite.com

***Counsel for Plaintiff***

## CERTIFICATION AND AUTHORIZATION

I, Robert W. Keogh, on behalf of the Sheet Metal Workers Local 17 Trust Fund ("Local 17"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the complaint in this matter and I am authorized in my capacity as Fund Administrator of Local 17 to initiate litigation and to execute this Certification on behalf of Local 17.

2.  Local 17 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Local 17 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Local 17's transactions in General Electric Company's common stock are set forth in the Schedule A attached hereto.

5.  Local 17 has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

6.  Local 17 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

7.  Local 17 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 17's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this  21  day of January, 2019.

Sheet Metal Workers Local 17 Trust Fund


Robert W. Keogh, Fund Administrator

## SCHEDULE A
### Sheet Metal Workers Local 17 Trust Fund
### Transactions in General Electric Company

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 04/19/18 | 5,890 | $13.97 |
| 07/06/18 | 199 | $13.68 |
| 07/06/18 | 322 | $13.71 |
| 07/06/18 | 5,444 | $13.83 |
| 10/05/18 | 4,290 | $13.17 |
| 10/05/18 | 2,307 | $13.23 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 06/04/18 | 5,890 | $13.72 |
| 09/24/18 | 2,534 | $11.66 |
| 09/24/18 | 1,358 | $11.70 |
| 09/24/18 | 2,073 | $11.71 |
| *Post CP Sales* | | |
| 11/15/18 | 2,262 | $8.20 |